# In the United States Court of Federal Claims

No. 15-1022C
(Filed under seal April 26, 2017)
(Reissued May 3, 2017)[†]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| **ENHANCED VETERANS SOLUTIONS, INC.,** | Post-award bid protest; service center operation support services; U.S. Citizenship & Immigration Services; solicitation interpretation; patent ambiguity; FAR §§ 15.304(d), 15.305; roll-up of subfactor ratings; FAR § 1.602-2(b); alleged disparate treatment; integrity and business ethics, FAR § 9.104-1(d); subcontractor past performance. |

ENHANCED VETERANS
SOLUTIONS, INC.,

             Plaintiff,

v.

THE UNITED STATES,

             Defendant,

   and

CENTRAL RESEARCH, INC.,

             Defendant-Intervenor.

Post-award bid protest; service
center operation support services;
U.S. Citizenship & Immigration
Services; solicitation interpretation;
patent ambiguity; FAR §§ 15.304(d),
15.305; roll-up of subfactor ratings;
FAR § 1.602-2(b); alleged disparate
treatment; integrity and business
ethics, FAR § 9.104-1(d); subcontractor
past performance.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

   *Alexander O. Levine*, PilieroMazza PLLC, with whom were *Pamela J. Mazza*, *Megan C. Connor*, *Patrick T. Rothwell*, and *Jacqueline K. Unger*, all of Washington, D.C., for plaintiff.

   *Domenique Kirchner*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Benjamin C. Mizer*, Principal Deputy Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Deborah A. Bynum*, Assistant Director, all of Washington, D.C., for defendant. *Joshua A. Kranzberg*, Associate Counsel, Department of Homeland Security, Washington, D.C., of counsel.

   *Gerald H. Werfel*, Baker, Cronogue, Tolle & Werfel, LLP, McLean, Virginia, for defendant-intervenor Central Research, Inc. *H. Todd Whay*, Sterling, Virginia, of counsel.

---

[†] This opinion, initially filed under seal, is reissued for publication, with the name of a third-party offeror redacted and some minor, non-substantive corrections made.

## OPINION AND ORDER

WOLSKI, Judge.

Enhanced Veterans Solutions, Inc. (eVETS) filed a bid protest seeking to enjoin the U.S. Department of Homeland Security's United States Citizenship & Immigration Services (USCIS or the agency) from proceeding with the contract for service center operations support services that was awarded to defendant-intervenor, Central Research, Inc. (CRI). Before the Court are the motions for judgment on the administrative record filed by each party pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims (RCFC). Among other things, eVETS argues that USCIS's evaluation was unreasonable, that the agency erred by excluding eVETS from the best value analysis, and that the award to CRI was improper. For the reasons stated below, the Court disagrees with plaintiff and finds that the agency's award to CRI was not arbitrary or unreasonable. Accordingly, defendant's and defendant-intervenor's motions for judgment on the administrative record are **GRANTED** and plaintiff's cross-motion for judgment on the administrative record is **DENIED**.

## I. BACKGROUND

### A. The Solicitation

The agency issued Solicitation No. HSSCCG-14-R-00027 (the Solicitation) on June 20, 2014. Admin. R. (AR), Tab 7c at 138–41. The Solicitation sought proposals to provide comprehensive records management services at USCIS's four service centers for a one-year base period and three one-year option periods.[1] AR, Tab 8b at 147. Two single-award contracts were to be awarded. *Id.* at 253. The contract at issue is the Group A contract for the Nebraska Service Center (NSC) and the Texas Service Center (TSC). *Id.* The USCIS service centers process correspondence, perform data entry, collect fees, provide file operation support services, and perform adjudication operations concerning most applications and petitions for immigration services and benefits. *Id.* at 147. The Solicitation explained that USCIS was shifting from a paper-based model towards the processing of applications and petitions online using the USCIS Electronic Immigration System (ELIS). *Id.* at 149. By using ELIS, an applicant may view his case status, access forms, and submit forms online. *Id.* As the service centers transition to ELIS, certain tasks will either no longer be performed or be performed at a reduced level. *Id.* The agency was seeking a proposal that would "result in improved efficient, accurate, and timely performance of . . . records management and support services." *Id.* at 147.

---

[1] The period of performance was later amended to shorten the base period to six months and add a fourth option period of six months. AR, Tab 26b at 1525.

## B.  Evaluation Criteria

The Solicitation informed offerors that an award would be made:

[T]o the responsible offeror that offers the best value to the Government, price and non-price factors considered.  In making this comparison, the Government is more concerned with obtaining performance capability superiority rather than the lowest overall price.  However, the Government will not issue an award to a contractor who presents a significantly higher overall price to achieve only slightly superior performance capabilities.  The Government will make this assessment through the development of a trade-off analysis.

AR, Tab 8b at 270.  Each proposal would be evaluated based on three factors: Technical, Price, and Past Performance.  *Id.* at 271.  Technical and Price were "approximately equal," and both were individually more important than Past Performance.  *Id.*  The Technical factor consisted of four subfactors: Operational Approach, Management Approach, Corporate Experience, and Experience with Unions.  *Id.*  The first three subfactors were all of "equal importance," while the fourth was of lesser importance.  *Id.*  The first volume of each offeror's submission was to be its Technical Proposal, addressing the Technical subfactors, AR Tab 8b at 257–59, and the second volume would be the Business Proposal, including Price and Past Performance information, *id.* at 260–64.

Under the Source Selection Plan (SSP), the Technical factor and each of its subfactors were to be rated based on five adjectival ratings.  AR, Tab 5 at 109.  The possible ratings were "Outstanding," "Good," "Acceptable," "Marginal," and "Unacceptable."  *Id.*  "Outstanding" was to be given to a proposal that "clearly demonstrates an outstanding understanding of all aspects of the requirement so that performance is expected to be of the highest quality," "has strengths that will very significantly benefit the Government," and has no identified weaknesses.  *Id.*  "Good" describes a proposal that "clearly demonstrates a good understanding of all aspects of the requirement so that performance is expected to be of high quality," "has strengths that will significantly benefit the Government," and contains no significant weaknesses.  *Id.*

The rating of "Acceptable" was to apply to a proposal that "demonstrates an acceptable understanding of the requirements" and "contains only minor or no strengths" and no significant weaknesses.  AR, Tab 5 at 109.  A proposal was to be found "Marginal" if it "demonstrates a marginal solution and approach and contains a significant weakness in any factor or sub-factor," and "does not meet the requirements to be rated Acceptable," but, if given the opportunity for discussions or clarifications, "has a reasonable chance of becoming Acceptable."  *Id.*  The rating of

"Unacceptable" was to be given to a proposal that "contains deficiencies and/or gross omissions; or failed to demonstrate an understanding of the scope of work necessary to perform the required tasks; or failed to provide a reasonable, logical approach to fulfilling much of the Government's requirements," and that requires significant revisions to be considered "other than unacceptable." *Id.*

The SSP mirrored the Federal Acquisition Regulation (FAR), *see* 48 C.F.R. § 15.001, in defining key rating terms. "Significant weakness" was defined as "[a] flaw in the proposal that appreciably increases the risk of unsuccessful contract performance." AR, Tab 5 at 110. "Deficiency" was defined as "[a] material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable risk." *Id.* Perhaps because the SSP employed the same adjectival ratings at the factor and subfactor levels, *see id.* at 109; *see also* AR, Tab 1 at 7–8, the Technical Evaluation Committee (TEC) adopted the following evaluation process: "In the event an offeror was rated Marginal or Unacceptable in any subfactor, that rating rolled up and became the overall rating for the factor because the proposal was determined to have either a significant weakness or a deficiency." AR, Tab 17 at 1019; AR, Tab 30 at 2054.

## C. Evaluation of Proposals and Award of Contract

Four amendments to the Solicitation were issued by USCIS prior to the proposal deadline. AR, Tabs 9–12. Of relevance, Amendment 1 was issued on July 3, 2014, and included answers to questions submitted by offerors regarding the Solicitation. AR. Tab 9a at 535. One question, submitted by eVETS, *see* Pl.'s Stat. Facts & Mem. Pts. & Auths. Supp. Cross-Mot. J. Admin. R. & Opp'n Def.'s Mot. J. Admin. R. (Pl.'s Mot.) at 9, asked whether the TSC ELIS immigration visa (IV) work --- described as "an average <u>monthly</u> volume of 40,000 which annualizes to 480,000 (960,00 [sic] to include both forms)" --- was a data collection function or a file operations function. AR, Tab 9b at 543. The agency responded: "ELIS IV processing is a file operation performed under CLIN 0006." *Id.*

Five offerors submitted proposals for the Group A contract by the July 22, 2014 deadline, including CRI and eVETS.[2] *See* AR, Tab 17 at 1018. Following the review and evaluation of the initial proposals by the TEC, eVETS had the best overall rating of Good for the Technical factor --- with a Good rating for Management Approach and for Corporate Experience, and Acceptable for the other two subfactors. *Id.* All other offerors received the rating of Marginal for the

---

[2] Plaintiff proposed that Veterans Enterprise Technology Solutions, Inc. (VETS) would serve as its major subcontractor. AR, Tab 15 at 785. Under the previous task order, VETS was the incumbent prime contractor for the Texas and Nebraska service centers and eVETS served as a subcontractor. *Id.*

Technical factor, presumably because each had an Operational Approach subfactor rating of Marginal. *Id.* at 1018–19. The Contracting Officer noted that eVETS was the highest priced offeror and the only one proposing higher costs than the Independent Government Cost Estimate (IGCE). AR, Tab 20 at 1315.[3] With the other four offerors having significant weaknesses in the area of staffing, and eVETS having the highest price and a weakness due to low staffing, the Contracting Officer decided to include all five offerors in the competitive range. *Id.* at 1315–16.

On December 23, 2014, Amendment 5 to the Solicitation was issued, AR, Tab 21, and discussion letters were sent to eVETS and the other offerors, AR, Tabs 22, 23, 78–80. In the letter to eVETS, concerning its Technical Proposal, the second of fourteen areas for discussion under the Operational Approach subfactor stated:

> **T2.** The staffing chart was determined to allocate insufficient numbers of employees in the following areas:
>> Data Collections at NSC. The 37 allocated [Full Time Equivalents] (FTEs) are not considered to be sufficient to meet base year requirements.
>> Data Collections at TSC. The 28 allocated FTEs are not considered to be sufficient to meet base year requirements.

AR, Tab 23 at 1487–88.

Concerning plaintiff's Business Proposal, the first area for discussion noted that the period of performance was to be revised, with the new base period of six months running through November 30, 2015, followed by three one-year option periods, and a fourth option lasting six months. *Id.* at 1489.[4] The fifth area for discussion referenced Attachment 1 to the letter, described as "Volumes and Hours for CLINs 6 and 8," and stated: "Volumes by center by period for CLIN XXX6 File Operations are provided. The volumes begin with GFY 13 incurred volumes and reflect a percentage decrement each period that USCIS expects to occur as a result of ELIS impacts." *Id.* at 1490. And in discussion areas eight through ten, under the Pricing Template category, eVETS was told:

> **B8. Summary Tab**---Proposed Full Time Equivalents (FTEs) and hours are significantly higher than the Government's estimate.

---

[3] Plaintiff, intervenor, and two other offerors received a Low Risk assessment for Past Performance, with the fifth assigned a Medium Risk. AR, Tab 20 at 1314.

[4] The solicitation originally called for a one-year base period ending November 30, 2015, and three one-year options. AR, Tab 8b at 144. The base period was modified by Amendment 1, to a separate two-month transition period through January 31, 2015, and a ten-month period ending November 30, 2015. AR, Tab 9d at 1569–70.

**B9. Summary Tab**---Proposed price is significantly high.
**B10. Summary Tab**---eVETS flat lined FTEs for all periods.  Volumes decrease each period for ELIS.  See Amendment No. 5, Attachment 1.

*Id.* at 1490.

Attachment 1 to the letter consisted of spreadsheets entitled "Contract Year Workload Activity Report," listing file operations for the Nebraska and Texas Service Centers.  *Id.* at 1492-1–1492-4.  Of particular relevance to this protest is the report concerning the TSC.  The first column of data apparently shows the number of times each of the listed file operations was processed in the period December 1, 2012, through November 30, 2013, a twelve-month period that aligns the endpoints of the four contract periods.  AR, Tab 23 at 1492-3.[5]  The other four columns projected that work over the periods of performance then in effect under the Solicitation (through Amendment 5).  In the next column representing the base period, the numbers of each operation from the December 2012 through November 2013 period are prorated over the ten-month base period and multiplied by 95 percent.  *Id.*  The next three columns represent the three option years, and multiply the first column figures by 85 percent, 75 percent, and 60 percent, respectively.  *Id.*  A notation below the data fields explains:  "These % represents [sic] the anticipated workload reduction from FY13 operation volumes due to USCIS ELIS implementation."  *Id.* at 1492-4.

Before submitting formal responses to the areas of discussion and revisions to their proposals, each offeror participated in a telephone conference call with agency officials, with the eVETS discussion apparently occurring on January 6, 2015.  *See id.* at 1487; *see also* AR, Tab 36 at 2421; Tabs 24a & 24b (discussion notes of Contract Specialist and Contracting Officer).  After the oral discussions, USCIS issued Amendment 6 on January 9, 2015, revising the period of performance as announced in the discussion letters --- a six-month base period ending November 30, 2015, and an additional six-month option period ending May 31, 2019.  *See* AR, Tab 26b at 1524–25; Tab 23 at 1489.  The amendment included an updated version of Attachment 1 to the discussion letters, the Contract Year Workload Activity Report.  *See* AR, Tab 26c at 1538 (revised report for the TSC).  Offerors were informed that the purpose of the revised Attachment 1 was "to reflect the correct period of performance and decrement volumes."  AR, Tab 26a at 1523.  The revised

---

[5]  Although the column heading is "FY13 Processed," a notation on the second line indicates the report is "for TSC from 12/1/2012 to 11/30/13."  AR, Tab 23 at 1492-3.  Prospective offerors had previously been given workload data for fiscal year 2013, which ran from October 1, 2012, to September 30, 2013, *see* AR Tab 6b at 134–35, containing the identical fields but slightly different numbers from the Attachment 1 data.

portions of the report were depicted in red.  *See* AR, Tab 26c at 1538.  The base period was changed to four months, *id.*, subtracting the two-month transition period from the new six-month base period, *see* AR, Tab 26b at 1527–28.  The data in the base year column changed, as it was now prorated over four rather than ten months.  *Compare* AR, Tab 23 at 1492-3 (ten-month figures) *with* Tab 26c at 1538 (four-month figures).  The only other revision concerning CLIN 6 file operations was the addition of a column with data for the fourth option period, prorated over six months and calculated at 60 percent of the levels for the year ending November 30, 2013.  AR, Tab 26c at 1538.  All of the fields describing the operations, and the data in the other columns, were unchanged from the prior version of the report.

On February 4, 2015, offerors submitted their final proposal revisions (FPRs) and responses to the areas for discussion.  AR, Tab 36 at 2421; *see* AR, Tab 29a at 1755 (eVETS response); Tab 29b at 1812 (eVETS FPR, Business Proposal); Tab 29c at 1941 (eVETS FPR, Technical Proposal).  Plaintiff made several changes to its final proposal, including increasing the number of proposed staffing for data collections at TSC and NSC.[6]  AR, Tab 29a at 1756–59.  In response to the B8 area for discussion, eVETS stated:

- Our original bid for CLIN 6 was based on the period FY 13 (10/1/12–09/30/13) data from the current SCOSS Task Order.  The Contract Year Workload Activity Report (Attachment 1 of Amendment 6) has since provided volumes of work from the period 12/01/12–11/30/13 that is now factored into this latest bid.  The volume of work provided in the Contract Year Workload Activity Report (Attachment 1 of Amendment 6) also included a decrease over the life of the contract which is in contrast to our original bid that did not factor in decreasing volumes.
- Our original proposed price included the movement of all ELIS work at the TSC from CLIN 4 to CLIN 6.  These volumes were added to the FY 13 volumes for CLIN 6 that were used in our original price proposal.
- The Contract Year Workload Activity Report volumes do not include ELIS work.  This equates to 50 FTEs at the TSC.
- The eVETS Final Proposal Revision provides FTEs in CLIN 6 based solely on the Contract Year Workload Activity Report (Attachment 1 Amendment 6).

*Id.* at 1789–90.

---

[6]  Plaintiff increased its proposed data collections staff level at NSC by 5.3 FTEs and at TSC by 2 FTEs.  AR, Tab 29a at 1756–59.

Despite this language in its discussion response, eVETS's revised Technical Proposal retained the language pledging "to process the TSC Visa Packets," which it noted "has an average monthly volume of 40,000 cases." AR, Tab 29c at 1982; *see also id.* at 1976 ("File Operations at the Service Centers involve a variety of tasks, to include Visa packet at the TSC."), 1994 ("Visa Packets ELIS" included in TSC basis of estimate at 3.1 per hour). But in the revised Business Proposal, eVETS reduced the overall level of staffing proposed to perform file operations at the TSC in the base year, from 260 FTEs to 176 FTEs. *See* AR, Tab 16a at 939; Tab 29b at 1908.

The FPRs were reviewed by the TEC and the Business Evaluation Committee (BEC). The TEC rated eVETS's overall Technical factor Marginal with subfactor ratings of Good in both Management Approach and Corporate Experience, Acceptable in Union Experience, and Marginal in Operational Approach. AR, Tab 30 at 2053. Under the Operational Approach subfactor, eVETS received two strengths, two weaknesses, and a significant weakness. AR, Tab 30 at 2070–71. The significant weakness was assigned due to concerns about file operations at the TSC, as the TEC found "[t]he allocated 176 FTEs . . . which is considered understaffed by over 80 FTEs demonstrates a failure to provide a reasonable, logical approach to fulfill much of the Government's file operations requirements." *Id.* at 2071. The TEC concluded that "the staffing plan is inadequate and the proposal lacks an explanation of how this staffing is sufficient that allows the TEC to determine the offeror can perform with this few staff, making this Subfactor Marginal." *Id.* In contrast, the TEC rated CRI's Overall Technical factor Good, with subfactor ratings of Acceptable for Management Approach and Good for Operational Approach, Corporate Experience, and Union Experience. *Id.* at 2053. One other offeror, [XXXXXXXXX] ([XXXXXXX]), received a Good rating for the Technical factor. *Id.* The other two received Technical factor ratings of Unacceptable and Marginal, respectively, reflecting the assignment of those same ratings for the Operational Approach subfactor. AR, Tab 30 at 2053.

For the Past Performance factor, the BEC assigned Low Risk to all offerors except [XXXXX], which was assessed to present a Medium Risk. AR, Tab 31a at 2109. Plaintiff's price of $97,565,189.16 was the second lowest on offer, nearly $15 million lower than intervenor's price --- which, in turn, was nearly $15 million lower than [XXXXX]'s price. AR, Tab 31b at 2154.

The Source Selection Advisory Committee (SSAC) --- composed of the directors of the four service centers to be supported by the work solicited, *see* AR, Tab 35 at 2418 --- and the Source Selection Authority (SSA), received a briefing from the chairmen of the TEC and BEC on April 3, 2015, *see* AR, Tab 34 at 2348, 2351; Tab 35 at 2412; Tab 36 at 2423. After reviewing the reports of the TEC and the BEC, the SSAC "did not take exception to any of the findings or conclusions" in the reports. AR, Tab 35 at 2414. The SSAC found that the eVETS ratings of

Marginal for the overall Technical factor and for the Operational Approach subfactor, and the "associated weaknesses and risks were too significant to overcome for consideration of an award." *Id.* at 2415. It "noted that the significant staffing concern was in more than one functional area," and that "[t]he file operations area is a Labor Hour CLIN which shifts all risk of performance/costs to the agency[,] further compounding the risks associated with the insufficient proposed staffing levels." *Id.* The SSAC found these concerns were further compounded by a "noted variation in productivity metrics" that was not credibly explained. *Id.* Due to its concerns regarding eVETS and the other offeror with a Marginal Technical factor rating, and with a third offeror rated Unacceptable under this factor, the SSAC determined that only CRI and [XXXXX] were viable for the award. *Id.* at 2414–15. It recommended that the award be made to intervenor. AR, Tab 35 at 2416.

The SSA reviewed the TEC and BEC reports and the SSAC's recommendation, and concurred in all respects. AR, Tab 36 at 2423–26. Regarding eVETS's proposal, the SSA pointed out concerns over eVETS's proposed staffing levels. The SSA stated that "despite being advised during discussions that [its] staffing was considered inadequate and making some minor adjustments to the data collections staffing at both NSC and TSC," eVETS further downsized what had been a properly-sized file operations workforce by over 80 FTEs. *Id.* at 2424. After reiterating the SSAC's concerns, *id.*, the SSA found the file operations staffing levels "an unacceptable risk" based on the likelihood that eVETS would be understaffed and unable to absorb the increased costs of hiring more workers, resulting in unbudgeted and disruptive contract cost increases for USCIS. *Id.* at 2425. Based on the above concerns with eVETS, the SSA did not consider eVETS viable for possible award and thus did not include eVETS in the best value trade-off analysis. *Id.* The SSA awarded the contract to CRI because CRI offered "the best integration of technical, price and past performance for Group A." *Id.* at 2426, 2428.

**D. The GAO Protest and Proceedings in This Court**

Plaintiff challenged the award of the Group A contract to CRI by filing a protest with the United States Government Accountability Office (GAO) on May 26, 2015. AR, Tab 43 at 2497. In its initial protest, eVETS argued that the agency materially erred by failing to consider the advantageous aspects of its proposal in a proper best-value analysis, *id.* at 2503–04; that the agency violated the Solicitation by making the Operational Approach subfactor more important than the others, *id.* at 2504–05; that the evaluation of its Operational Approach was unreasonable, *id.* at 2506–18; that it should have received a higher rating than CRI under the Experience with Unions subfactor, *id.* at 2518–19; that CRI should have received lower ratings for the Corporate Experience subfactor and the Past Performance factor, *id.* at 2519–21; that intervenor's proposal showed that CRI would impermissibly perform less than 50 percent of the contract, *id.* at 2521–22; that CRI

should have been found not responsible due to alleged concerns about its subcontractor, *id.* at 2522–23; and that intervenor should have been found to have overstaffed its proposal, *id.* at 2523. Seven weeks later, eVETS filed a supplemental protest, adding the argument that CRI's revised Technical Proposal was one page longer than the limit and, as a consequence, its last page --- containing intervenor's entire discussion of the Experience with Unions subfactor --- should have been disregarded. AR, Tab 50 at 2675.

On September 3, 2015, the GAO denied the protest in part and dismissed the remainder, after finding no basis to sustain the protest. AR, Tab 59 at 2754, 2759, 2763. The GAO explained that eVETS's interpretation of Attachment 1 to Amendment 6 would have created a patent ambiguity the clarification of which was not timely sought, and that it was reasonable for the agency to evaluate the TSC file operations staffing based on the required ELIS IV work. *Id.* at 2760–61. The GAO found that the Solicitation did not require the mechanical combination of Technical subfactor ratings, and that the eVETS proposal was technically unacceptable and thus properly excluded from the best value determination. *Id.* at 2761–63. The remaining protest grounds were dismissed because plaintiff, having been found ineligible for award, lacked the requisite interest to raise them. *Id.* at 2763.

Eleven days later, eVETS filed its complaint in our court, containing six counts. Count I alleged that USCIS unreasonably evaluated eVETS's proposal under the Operational Approach subfactor. Compl. ¶¶ 27–51. Count II argued that in basing the eVETS proposal's Marginal rating for the Technical factor on just the Operational Approach subfactor, the agency failed to follow the Solicitation's evaluation criteria. *Id.* ¶¶ 52–64. In Count III, eVETS claimed that the best value analysis was improper due to the exclusion of its proposal. *Id.* ¶¶ 65–77. Count IV alleged disparate treatment in the agency's evaluation of plaintiff's training plan, quality control plan, and use of proprietary data tools. *Id.* ¶¶ 78–88. Count V challenged the reasonableness of USCIS's assessment of CRI's past performance and corporate experience. *Id.* ¶¶ 89–101. And in Count VI, eVETS argued that USCIS unreasonably ignored available and relevant information concerning intervenor's proposed subcontractor in determining that CRI was responsible. *Id.* ¶¶ 102–14.

Along with its complaint, eVETS filed an application for a preliminary injunction and a temporary restraining order. Pl.'s Appl. Prelim. Inj. & TRO, ECF No. 4. After that motion was fully briefed, and at the conclusion of a hearing on the motion, the Court denied plaintiff's requested preliminary injunction, due to eVETS's failure to demonstrate a likelihood of success on the merits. *See* Order (Sept. 18, 2015), ECF No. 26. The parties then fully briefed motions for judgment on the administrative record, and plaintiff moved for leave to supplement the administrative record with a declaration from an officer of VETS and documents concerning intervenor's proposed subcontractor, FCi Federal, Inc. (FCi), *see* Pl.'s

Mot. Suppl. Admin. R. (Pl.'s Mot. Suppl.), ECF No. 35.[7]  At the end of a lengthy hearing on the motions for judgment on the administrative record, held two days before intervenor was to begin full performance of the contract, the Court indicated that handover of the contract would not be enjoined, and explained its tentative intention to decide matters in favor of defendant and intervenor.  Tr. (Oct. 8, 2015) (Tr.) at 251–54.  After a full and thorough consideration of the record and arguments of counsel, the Court is confirmed in that view, and explains its ruling below.

## II.  DISCUSSION

### A.  Legal Standards

The Administrative Dispute Resolution Act (ADRA) amendments to the Tucker Act require our court to follow Administrative Procedure Act (APA) standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

> reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2012).

Based on an apparent misreading of the legislative history, *see Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that the *de novo* review standard of 5 U.S.C. § 706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as procurement awards.  *See Citizens to Pres. Overton Park, Inc. v. Volpe* (*Overton Park*), 401 U.S. 402, 415 (1971).  Instead,

---

[7]  The government opposed the motion to supplement, *see* Def.'s Opp'n to Pl.'s Mot. Suppl. (Def.'s Suppl. Opp'n), ECF No. 40, and plaintiff filed a reply in support of the motion, *see* Pl.'s Reply to Def.'s Suppl. Opp'n, ECF No. 43.

courts in those cases are supposed to apply the standard of 5 U.S.C. § 706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (applying 5 U.S.C. § 706(2)(A)). *But see Impresa Construzioni Geom. Domenico Garufi v. United States* (*Domenico Garufi*), 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) (also citing 5 U.S.C. § 706(2)(D) as applicable in bid protests). The "focal point for judicial review" is usually "the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even when the matter under review was not the product of a formal hearing. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009).

A motion for judgment on the administrative record pursuant to RCFC 52.1 differs from a motion for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355–57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the agency, "given all the disputed and undisputed facts appearing in the record, acted in a manner that was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Fort Carson*, 71 Fed. Cl. at 585; *see also Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp.*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, this court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Overton Park*, 401 U.S. at 416. Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* This court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974). This court must determine whether "the procurement official's decision lacked a rational basis." *Domenico Garufi*, 238 F.3d at 1332 (adopting APA standards developed by the D.C. Circuit); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or

regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). This entails determining whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or made a decision that was "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ala. Aircraft Indus., Inc.– Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis." *Domenico Garufi*, 238 F.3d at 1333 (internal quotation marks omitted) (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). The protester must demonstrate, by a preponderance of the evidence, the absence of any rational basis for the agency decision. *See Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Applications. Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003). If arbitrary action is found as a matter of law, this court will then decide the factual question of whether the action was prejudicial to the bid protester. *See Bannum*, 404 F.3d at 1351–54.

The interpretation of a solicitation, as that of contract provisions generally, is a question of law which courts review *de novo*. *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1353 (Fed. Cir. 2004). Whether a provision in a solicitation is ambiguous, and whether an ambiguity is latent or patent, are also questions of law over which courts exercise independent review on a case-by-case basis. *NVT Techs.*, 370 F.3d at 1159; *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed. Cir. 1996). When interpreting a solicitation, the document must be considered as a whole and interpreted in "a manner that harmonizes and gives reasonable meaning to all of its provisions." *Banknote Corp.*, 365 F.3d at 1353; *NVT Techs.*, 370 F.3d at 1159. If the provisions are clear and unambiguous, the court must give them "their plain and ordinary meaning." *Banknote Corp.*, 365 F.3d at 1353 (citation omitted).

## B. Analysis

### 1. The Agency Did Not Act Unreasonably in Assigning eVETS a Marginal Rating under the Operational Approach Subfactor

Plaintiff's first ground for its protest challenges USCIS's determination that its proposal warranted a significant weakness and the resulting Marginal rating under the Operational Approach subfactor.  Pl.'s Stat. Facts & Mem. of P & A in Supp. Cross-Mot. J. Admin. R. & Opp'n Def.'s Mot. J. Admin. R. (Pl.'s Mot.) at 14–31.  According to the SSP, a "Marginal" rating was to be assigned to a factor or subfactor that "demonstrates a marginal solution and approach and *contains a significant weakness in any factor or sub-factor*."  AR, Tab 5 at 109 (emphasis added).  A "Significant weakness" was defined as "[a] flaw in the proposal that appreciably increases the risk of unsuccessful contract performance."  *Id.* at 110.  The agency gave eVETS a significant weakness for Operational Approach because plaintiff's "staffing chart was determined to allocate insufficient numbers of employees for file operations at the TSC," as "[t]he allocated 176 FTEs . . . which is considered understaffed by over 80 FTEs demonstrates a failure to provide a reasonable, logical approach to fulfill much of the Government's file operations requirements."  AR, Tab 30 at 2071.  In challenging this determination, plaintiff makes three distinct arguments, considered in turn.

### a.  Plaintiff's explanation for its staffing reduction.

Plaintiff cannot dispute the TEC's finding that its final proposal reduced the base year FTEs proposed to perform file operations at the TSC by more than 80 from the initial proposal, resulting in a total staffing of 176 to perform the CLIN 6 functions at that center.  *See* AR, Tab 30 at 2066, 2071.  Plaintiff initially proposed 260 FTEs to perform this work, including quality control staff (but not the site quality manager).  *See* AR, Tab 15 at 808; Tab 16 at 939, 941.  In its FPR, this number was reduced to 176.2 FTEs (including the site quality manager).  *See* AR, Tab 29c at 1990; Tab 29b at 1908.  Not counting the task managers, drivers, and quality control personnel, the number of file operations staff proposed for the base year was 160.2 FTEs.  *See* AR, Tab 29c at 1990.  The TEC report stated that "[t]he TEC does not consider the proposed file operations workforce of 160 sufficient to meet the base year requirements."  AR, Tab 30 at 2066.

The TEC further explained that "for the TSC in particular, [it] considers the proposed staffing inadequate and lacking in explanation as to why the offeror considers it sufficient."  *Id.* at 2067.  Using the eVETS labor basis of estimate figure for processing visa packets at the TSC, the TEC calculated that plaintiff would need "approximately 580 hours of labor to complete our daily average of 1,800 packets," equating to 77 FTEs --- leaving less than 90 FTEs to perform the rest of the file

operation tasks. *Id.* at 2068.[8]  The significant weakness assigned to eVETS rested on the finding of "insufficient numbers of employees for file operations at the TSC," which was found to be "understaffed by over 80 FTEs."  *Id.* at 2071.  The subfactor evaluation concluded that "the staffing plan is inadequate and the proposal lacks an explanation of how this staffing is sufficient that allows the TEC to determine the offeror can perform with this few staff, making this Subfactor Marginal."  *Id.*

In the briefing given to the SSAC and the SSA, the TEC reiterated that it "does not consider the proposed file operations workforce sufficient to meet requirements."  AR, Tab 34 at 2364.  The TEC finding that the TSC file operations staffing was "inadequate and lacking in explanation as to why the offeror considers it sufficient" was quoted in the SSAC report, AR, Tab 35 at 2415, and in the SSA's decision, AR, Tab 36 at 2424.

Plaintiff's first argument concerning the significant weakness it received for the Operational Approach subfactor focuses on a different statement of the TEC, one not referenced by the SSAC or the SSA.  After noting the reduction in file operations staffing proposed for the TSC, the TEC stated:  "There was no narrative provided by the offeror explaining the drastic changes from their [sic] original staffing after being advised during discussions the TEC considered the staffing to be inadequate."  AR, Tab 30 at 2066.[9]  Plaintiff disputes this, pointing to a passage in its response to discussion questions, and argues that the TEC overlooked this explanation for its revised staffing levels.  Pl.'s Mot. at 14–16 (citing AR, Tab 29a at 1789–90).

If the TEC did overlook this passage, it would be understandable.  The passage responds to the first in a series of discussion questions from the BEC (and not the TEC), focusing on the aggregate hours, FTEs, and costs identified in a summary tab in the pricing template for all periods of performance.  *See* AR, Tab 29a at 1789–90; Tab, AR, Tab 16a at 898; AR, Tab 19b at 1292–93.  The first of these questions noted that proposed FTEs and hours were "significantly higher than the Government's estimate," and the third revealed why --- as "eVETS flat lined FTEs for all periods," although "[v]olumes decrease each period for ELIS." AR, Tab 23 at 1490.  While these questions implicitly concern only the file operations CLIN --- as offerors were given spreadsheets to use for the fixed-unit

---

[8]  The 3.1 per hour estimate was carried over in a table reproduced from the initial proposal.  *See* AR, Tab 15 at 809.  The revised table in the FPR eliminated the "Visa Packets ELIS" field, formerly number 6.33.  *See* AR, Tab 29c at 1994.

[9]  The briefing provided to the SSAC and SSA included an abbreviated form of the statement:  "There was no narrative provided by the offeror explaining the drastic changes from their [sic] original staffing."  AR, Tab 34 at 2364.

price CLINs, with identified annual workloads decreasing over time due to ELIS efficiencies, *compare* AR, Tab 14 at 721–24 (CRI spreadsheets) *with* AR, Tab 16 at 900–03 (eVETS spreadsheets), precluding any possibility of flat lining --- they would not be the place one would expect to find an explanation for changes to the base year FTEs proposed.[10]

In any event, there are two problems with this argument of eVETS. The passage it believes that the agency ignored seems, in a rather circuitous fashion, to suggest that 50 FTEs who would perform ELIS work were removed from the file operations staffing proposed for the TSC, based on eVETS's belief that only the workload listed in Attachment 1 to Amendment 6 should be used for purposes of the final proposal. AR, Tab 29a at 1789–90. First, if the TEC was truly faulting eVETS for not explaining the "drastic changes" in proposed staffing which reduced file operations by 84 FTEs, a discussion covering just 50 FTEs would fall well short of the mark. But more significantly, the TEC interpreted the Solicitation as requiring the ELIS IV work as a file operation at the TSC, *see* AR, Tab 30 at 2068, and its actual concern was that "the proposal lacks an explanation of how this staffing is sufficient that allows the TEC to determine the offeror can perform with this few staff," *id.* at 2071. Instead of explaining how it would perform all of the required work, in the discussion response eVETS was suggesting that certain work need not be proposed. *See* AR, Tab 29a at 1789–90 (eVETS explaining that "[t]he Contract Year Workload Activity Report volumes do not include ELIS work" and that its FPR "provides FTEs in CLIN 6 based solely on the Contract Year Workload Activity Report").[11]

Thus, the eVETS discussion response did not contain the answer that the TEC found lacking, but instead questioned the TEC's premise. A review of that passage does not demonstrate that the agency objectively misstated what eVETS

---

[10] The only portion of the eVETS response to discussion questions cited in the TEC report concerned a question from the TEC. *See* AR, Tab 30 at 2067 (citing AR, Tab 29a at 1766 (part of response to question T8)).

[11] Plaintiff has moved to supplement the administrative record with, among other things, a declaration from a VETS executive explaining why she believed ELIS IV processing was not required, and how --- through ELIS productivity advances and file operations staff efficiency gains --- that work could nevertheless be done with the staffing proposed by eVETS. *See* Ex. A to Pl.'s Mot. Suppl. For such explanations to be relevant to these proceedings, they needed to be included in the eVETS FPR. The Court is not persuaded that effective review of a procurement decision requires that the record be supplemented with information an offeror neglected to provide to the procuring agency, and thus the motion to supplement the administrative record is DENIED regarding this declaration. *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009).

proposed, *see USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 462 (2010), but rather points to a disagreement concerning the proper interpretation of the Solicitation. This leads into plaintiff's second argument, to which we now turn.

## b.  Amendment 6 and ELIS IV processing.

Plaintiff's second argument concerns its interpretation of the updated Contract Year Workload Activity Report regarding file operations at the TSC, which was part of Attachment 1 to Amendment 6 of the Solicitation.  *See* AR, Tab 26c at 1538.  This document was a revision of a spreadsheet distributed to offerors with the discussion letters, *see* AR, Tab 23 at 1492-3, adjusted to reflect a base period of four rather than ten months, and an additional option period of six months, *see* AR, Tab 26c at 1538.  The first column of data on these reports is the number of times, for the year ending November 30, 2013, each task that had been reported as a file operation under the predecessor contract was processed at the TSC.  The task fields are identical to the ones contained in the file operations portions of the Fiscal Year Workload Activity Report spreadsheets that had been provided to potential offerors. *See* AR, Tab 6b at 128–29, 131–32, 134–35.[12]  To the extent Immigrant Visa packet processing, involving forms I-864 and DS-230,[13] had been reported under the predecessor contract, this was as a data collection operation rather than a file operation.  *See id.* at 128, 131, 134.[14]  As the fields containing this data were not under the file operations heading in the historical reports, the Contract Year Workload Activity Report --- copying verbatim the file operations fields from those reports --- did not contain data concerning IV packet processing.  Plaintiff interprets this omission as the agency's decision to remove IV packet processing from the work to be proposed, and argues this is the only reasonable interpretation of this attachment to Amendment 6.  Pl.'s Mot. at 16–27.

Considering the Solicitation as a whole, and giving "reasonable meaning to all of its provisions," *Banknote Corp.*, 365 F.3d at 1353, the Court does not agree that the attachment to Amendment 6 had the effect of removing IV packet

---

[12]  These same spreadsheets were provided to offerors on a compact disk, as PWS Attachment 8.6, described as "historical volume information," to be used "as a guide" in creating the pricing spreadsheets of proposals.  AR, Tab 8b at 262; *see* AR, Tab 8k at 404.

[13]  The DS-230 form was previously known as the OS-155A. Tr. at 135.

[14]  While IV processing includes scanning these forms and verifying their data, and thus the numbers for each form suggests the amount of IV packets processed, it also involves other tasks such as assembling a paper A-File, *see* AR, Tab 8b at 150, which apparently were not reported under any of the CLINs of the predecessor contract, *see* Tr. at 19.

processing from the work to be proposed.  In the "General Scope of Work" section of the PWS, while offerors were informed that the use of online filings via the ELIS system would "eliminate[] data entry" --- with an "Immigrant Visa (IV) processing exception" --- and reduce file operations, they were also told that "[t]he TSC processes approximately 40,000 immigrant visa packets each month."  AR, Tab 8b at 149–50.  This processing was described to include such tasks as "completing data capture of the packet into USCIS ELIS, ordering a Permanent Resident Card for the immigrant, and creating a physical A-File of the packet contents."  *Id.* at 150.  Of the three forms involved in the process, ELIS would eliminate the scanning of but one.  *Id.*

In the "Contractor Tasks/Requirements" section of the PWS, the "File Operations Support" section begins by informing contractors they must "receive, store, retrieve, maintain, and distribute files," and notes that "[u]nder USCIS ELIS, existing paper files (primarily A-Files) will continue to be utilized in conjunction with adjudication of a USCIS ELIS record."  *Id.* at 160 (¶ 4.5).  One subparagraph required contractors to "track and update files in the National File Transfer System," and another required them to "process documents received from district, port of entry, or consulate offices."  *Id.* at 162, 166 (¶¶ 4.5.6, 4.5.22).  The processing of IV packets, *see* AR, Tab 8j at 396, which are sent to TSC from the port of entry, *see* AR, Tab 8b at 150, would fall in these categories.

Plaintiff argues that IV processing is not explicitly discussed in the two PWS requirements sections (¶¶ 4.1 & 4.5) that are identified as corresponding to file operations in the Schedule of Services overview.  Pl.'s Mot. at 18 & n.5 (discussing AR, Tab 8u at 432).  But the requirements are described at a general level, and rarely mention any of the specific tasks or forms that are processed under data collection or file operations.  *Compare* AR, Tab 8b at 151–53, 156–68 (using general terms such as documents, files, forms, materials) *with* AR, Tab 6b at 133–35 (listing specific descriptions of tasks and forms).  Even less plausibly, eVETS stresses that "no ELIS IV work was included in the Solicitation's Schedule of Services."  Pl.'s Mot. at 17.  But the Schedule of Services for the fixed-unit-priced CLIN for data collection support was a spreadsheet which folded all tasks into three lines --- one for forms requiring the entry of one to twenty-five fields, another for forms requiring the entry of more than twenty-five fields, and a third for forms that were manually rejected.  *See* AR, Tab 21b at 1330.[15]  And the Schedule of Services for labor hour pricing CLINs, like file operations support, was a blank spreadsheet into which an offeror would enter its own labor categories, proposed hours, and proposed rates.  *Id.* at 1337–38.  Thus, no specific work at all was included in the Schedule of

---

[15]  The referenced document is the Schedule of Services provided with Amendment 5, which changed the base period from ten months to four months.  The format is otherwise the same as initially provided.  *See* AR, Tab 16b at 973 (initial eVETS proposal).

Services --- the only specific information provided was the annual estimated quantities of documents falling into the three data collection operations categories. *Id.* at 1330.

For the original, ten-month base period, the Schedule of Services provided offerors with an estimated quantity of 300,000 forms to be processed in Tier 1 (requiring up to 25 data fields), and 30,000 forms to be processed in Tier 2 (requiring more than 25 fields of data).  *See* AR, Tab 16b at 973.  But Attachment 8.4 to the Solicitation stated that the number of fields associated with the two forms used in IV packet processing, the I-864 and the OS-155A, were 32 and 34, respectively, and that the TSC processed 364,509 of the former and 569,233 of the latter in fiscal year 2013.  AR, Tab 8h at 339–40, 346.  Elsewhere, the same attachment listed as file operations the entry of "ELIS data fields" totaling 23 for the I-864 and 38 for the OS-155A.  *Id.* at 341.  When eVETS detected these discrepancies, and noted that with a monthly volume of 40,000 IV packets there would be 960,000 forms annually between the two of them, it submitted a question to the agency.  Plaintiff asked whether ELIS IV packet processing was to be proposed under data collection or file operations, and the agency responded:  "ELIS IV processing is a file operation performed under CLIN 0006."  AR, Tab 9b at 543.  If the matter had previously been in doubt, this answer, submitted to all offerors as part of Amendment 1 to the Solicitation, clarified that this work was a file operation.[16]

Plaintiff maintains that the issuance of the revised Attachment 1, distributed along with Amendment 6 to the Solicitation,[17] could only mean that IV packet processing was no longer to be included in proposals.  The email which accompanied this document described it as "Revised Attachment 1 (CLIN 6 Volumes and CLIN 8 Hours), Group A (NSC/TSC) to reflect the correct period of performance and decrement volumes."  AR, Tab 26a at 1523.  It was a *revised* Attachment 1, as

---

[16]  A close review of other Solicitation materials demonstrated that this work was to be proposed under file operations.  Attachment 8.5 to the Solicitation contained a glossary and sample forms for the periodic reporting of forms processed.  AR, Tab 8j at 385–402-5.  The tasks of creating OS-155A IV packet A-Files, processing IV packets in ELIS, and verifying IV packet data were all placed under file operations.  *Id.* at 396, 400, 402-4–402-5.  The processing of I-864 forms was to be counted under data collection "when done in C3, but not when done in ELIS," *id.* at 391, and data entry connected with the OS-155A was considered data collection when the legacy CLAIMS 3 system was used, *id.* at 392.

[17]  Although all of the parties have treated this attachment as part of Amendment 6, and for purposes of these motions the Court has done the same, it is nevertheless noted that Amendment 6 itself makes no reference to the attachment.  *See* AR, Tab 26b at 1524–36.

the original was distributed along with the discussion letters, seventeen days earlier. *See* AR, Tab 23 at 1492-3. Plaintiff places great emphasis on the phrase "correct period of performance and decrement volumes," insisting that this means that the volumes contained on the spreadsheet are correct and no other work can be required under CLIN 6. Pl.'s Mot. at 21; *see also* Pl.'s Reply in Supp. Mot. J. Admin. R. (Pl.'s Reply) at 3–5. But what was corrected from the previous iteration were the length of the base period, which was converted from ten to four months, and the number of option periods, as a fourth option of a six-month duration was added. *Compare* AR, Tab 23 at 1492-3 *with* AR, Tab 26c at 1538. To the extent that any "decrement volumes" could be said to have been corrected, this was the by-product of changing the base period. Even the additional option year did not represent any "volume" that was reduced, as its column used the same numbers as the previous option period.[18] Moreover, the reduced levels of operations from year to year were not the result of some determination of the particular volume expected for each operation, but the result of applying the same percentage to all totals from the 2013 workload data. *See* AR, Tab 26c at 1538. The most natural reading of this phrase is the only reasonable one, and the Court concludes that "correct" was only modifying "period of performance."

Despite plaintiff's best efforts, the Court fails to understand how the use of the words "decrement volumes" rather than "volume decrements" makes any difference in construing the words of the agency email --- either way, it means the amounts by which the figures were reduced. And even if the spreadsheet reflected the correct reductions, this would only be true for the work listed in the first place. In any event, an agency would hardly remove a requirement from a Solicitation in the roundabout manner suggested by plaintiff --- by not adding a new field of data to an updated version of a spreadsheet, when the requirement was previously recognized despite its absence from this spreadsheet.

Plaintiff contends that the areas for discussion the agency sent to it suggested that the IV packet processing work was not required in proposals, and that if this was not the case, then the discussion areas were misleading. Pl.'s Mot. at 22–24; Pl.'s Reply at 8–9. In the Technical Proposal portion of the discussion letter, eVETS was told that its data collections FTEs were "not considered to be sufficient to meet base year requirements," AR, Tab 23 at 1487–88, while the Business Proposal portion stated that plaintiff's "[p]roposed Full Time Equivalents (FTEs) and hours [were] significantly higher than the Government's estimate" and its "[p]roposed price [was] significantly high," *id.* at 1490. From this, eVETS maintains that it reasonably concluded that file operations FTEs should be reduced. Pl.'s Reply at 8–9; Pl.'s Mot. at 22. But the understaffing comments regarding data

---

[18] Incidentally, the volumes contained in the Option 4 column are on their face decidedly *not correct*, as they are the same ones depicted for Option 3, which covers a period that is twice as long. *See* AR, Tab 26c at 1538.

collections expressly concerned "base year requirements," while the excessive hours and price comments concerned the "Summary Tab" of the pricing template, which contained the total costs per CLIN for each year and the total hours and FTEs per contract period.  AR, Tab 16b at 971.  Moreover, the Business Proposal comments included the statement that "eVETS flat lined FTEs for all periods," and noted that "[v]olumes decrease each period for ELIS" --- citing the initial version of Attachment 1.  AR, Tab 23 at 1490.  Thus, the agency informed eVETS that data collections were understaffed in the base year, and that overall costs, FTEs and hours were too high because of its failure to reduce effort in the out years to match reduced volumes of work due to ELIS.  These discussion comments were not misleading, were sufficiently specific, *see Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 611 (2006), and could not reasonably have been taken to mean that file operations were overstaffed in the base year.

In support of its argument that the revised Attachment 1 should be construed as removing IV packet processing from the work to be proposed, eVETS infers from the proposals of its competitors that they, too, reached this conclusion.  Pl.'s Mot. at 24–27; Pl.'s Reply at 10.  But nothing has been identified in their proposals to indicate that the IV packet processing work was removed from the FPRs.  All four of the other offerors had each been told that they initially proposed too few staff to meet the base year file operations requirements at the TSC, AR, Tab 22 at 1481; Tab 78 at 4971; Tab 79 at 4979; Tab 80 at 4985; and three of the four responded by increasing the number of base year staffing, *see* AR, Tab 28 at 1544; Tab 63a at 3477; Tab 63e at 3798–3800; Tab 65a at 4159.  Plaintiff places great stress on the outlier, which was told that its proposed FTEs for data collections and file operations at both the TSC and NSC were not "sufficient to meet base year requirements," but responded by *reducing* the base year FTE totals for three of the four identified areas.  *See* AR, Tab 61b at 2969–70.  Although that offeror explained that these lower totals were the result of plugging into a model "the new workload volumes provided in *Amendments 5* and *6*," *id*. at 2969 (italics in original), from the manner in which information is presented in the proposals, it is impossible to know if IV packet processing was originally included and then removed.[19]

The final argument of plaintiff relating to the interpretation of the revised Attachment 1 is that, if the absence of IV packet processing data did not clearly remove this work from requirements, this at least resulted in a latent ambiguity concerning the matter.  Pl.'s Mot. at 27–28.  As is explained above, the Court does not believe that ELIS IV processing, which was clearly identified as part of the TSC file operations in the agency response to Question 24, *see* AR, Tab 9b at 543, could reasonably be viewed as having been deleted from the Solicitation by being absent from an updated spreadsheet that never contained this work in the first place.  But

---

[19]  That offeror retained in its FPR an historical reference to experience with "ELIS implementation of DS-230 IV forms at TSC."  AR, Tab 61c at 3012.

the Court recognizes that there are two reasonable interpretations of the impact of revised Attachment 1 on this work, and both have been used by the government in this case. Government counsel argued that the absence of ELIS IV processing from the spreadsheet meant that the decrement percentages depicted for the option years would not apply to this work. *See* Tr. at 150–52. The agency, however, applied those percentages to ELIS IV processing in calculating the Independent Government Cost Estimate. *See id.* at 234–36 (discussing AR, Tab 75b). As the Solicitation provided offerors with reductions in the volumes of all of the rest of the work to be performed, *see* AR, Tab 21b at 1330–34; AR, Tab 26c at 1538, the absence of information on how to treat the 480,000 IV packets that were processed at the TSC was the sort of "obvious, gross, or glaring" ambiguity that is necessarily patent, *NVT Techs.*, 370 F.3d at 1162 (citing *H & M Moving, Inc. v. United States*, 204 Ct. Cl. 696, 716 (1974)). As plaintiff failed to inquire about whether this work should be reduced or remain constant, the ambiguity cannot be challenged in this proceeding. *Id.* In any event, neither reasonable interpretation of the Solicitation is advanced by eVETS, which instead embraces an interpretation that has been found unreasonable for the reasons stated above.

### c. Strengths and weaknesses were not arbitrarily assigned.

The third argument raised by eVETS to challenge its rating under the Operational Approach subfactor focuses on the details of the evaluation. Pl.'s Mot. at 28–31. First, eVETS maintains that its reduced ratio of employees proposed to work performed actually reflects productivity gains. *Id.* at 28. Plaintiff argues that a sufficient number of TSC file operations staff will be liberated by its expected efficiencies such that, combined with available surge support staffing, all of the ELIS IV processing work can nevertheless be performed. *Id.* at 28–29 & nn.11–12. The problem with this argument is that it is based on explanations of productivity and the use of the surge CLIN that were not included in its proposals.[20]

Plaintiff next maintains that it was unreasonable for it to receive a Marginal rating based on the low number of file operations staff proposed for the TSC, when another offeror proposed but 19 more and received a Good rating. *Id.* at 29. But challenges concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess." *E.W. Bliss Co.,* 77 F.3d at 449. Such subjective judgments will only be disturbed when inconsistencies are demonstrated, *USfalcon*, 92 Fed. Cl. at 462, which is not the case when the offeror with the higher rating also proposed a higher staff level.

---

[20] Plaintiff relies on explanations contained in a declaration that it sought, unsuccessfully, to add to the administrative record. *See supra* note 11.

The rest of this argument similarly concerns minutiae. Plaintiff complains that its explanation for the differences in tasks per hour between the two centers was found by the TEC to be "not credible," AR, Tab 30 at 2067; *see* Pl.'s Mot. at 30. But this finding did not result in a weakness or risk being assigned to eVETS, *see* AR, Tab 30 at 2070–71, and the difference in opinion was explained by the agency, *id.* at 2067. Plaintiff also challenged the TEC's finding of a risk of "an immediate front log forming in data collection at both centers," AR, Tab 30 at 2071, although plaintiff was found to have proposed adequate staffing for the NSC, *id.* at 2066, and plaintiff believed it explained how it could cover data collections with other staff, Pl.'s Mot. at 30 (citing AR, Tab 29a at 1756–59). While there appears to be no explanation as to why the TEC believed that data collections at the NSC would be impacted by the insufficient staffing at the TSC, this risk had no impact on the rating eVETS received --- as the significant weakness assigned due to the understaffing of file operations at the TSC alone warranted a Marginal rating under the methodology used in the procurement. *See* AR, Tab 30 at 2054, 2071. And while it might appear to be overkill for the TEC to have found separate data collections weaknesses for the staffing chart depicting FTEs and for the number of FTEs proposed for the TSC, other offerors received similar treatment. *See id.* at 2080–81, 2091. We are not in the business of second guessing the judgments of evaluators, *E.W. Bliss Co.,* 77 F.3d at 449, and eVETS has not demonstrated the sort of subjective inconsistencies or objective inaccuracies, *see USfalcon,* 92 Fed. Cl. at 462, which would have rendered the Operational Approach subfactor evaluation an arbitrary and capricious one.

### *2. The Agency Did Not Violate the Solicitation by Assigning eVETS a Marginal Rating for the Technical Factor*

In plaintiff's second challenge, it argues that USCIS failed to follow the Solicitation's evaluation criteria by assigning a Marginal rating to eVETS's overall Technical factor. Pl.'s Mot. at 31–40; Pl.'s Reply at 13–17. The Solicitation provided that three of the four Technical subfactors were of equal importance, AR, Tab 8b at 271, but the adjectival ratings adopted in the SSP applied both to the Technical factor and to its subfactors --- thus, the presence of a significant weakness or a deficiency under any of the latter would result in an overall rating of Marginal or Unacceptable, respectively, for the former, *see* AR, Tab 5 at 109. Utilizing this methodology, the TEC explained that "[i]n the event an offeror was rated Marginal or Unacceptable in *any subfactor*, that rating rolled up and became the overall rating for the factor because the proposal was determined to have either a significant weakness or a deficiency." AR, Tab 30 at 2054 (emphasis added).

Plaintiff contends that by automatically rolling-up the Operational Approach subfactor's Marginal rating to be the overall Technical factor rating, the Solicitation was violated because the agency failed to adequately consider the merits of the other subfactors. Pl.'s Mot. at 31–38. It argues that this approach gave "100% of

the weight" to the Operational Approach subfactor, *id.* at 32 (emphasis omitted), although two other subfactors were supposed to be equally important.

The government counters that eVETS is taking issue with the evaluation methodology, which the FAR does not restrict and does not require to be disclosed in a solicitation. Def.'s Mot. J. Admin. R. (Def.'s Mot.) at 22 (citing 48 C.F.R. § 15.305(a), (d)). Defendant explains that the roll-up approach served the purpose of ensuring that significant weaknesses and deficiencies were not overlooked in the overall factor evaluation, as might be the case had the agency followed a method which averaged subfactor ratings, *id.* at 22–24, and notes that the Federal Circuit has rejected the notion that "adjectival ratings can be added up and 'averaged out' to score the contractor," *id.* at 24 (quoting *Glenn Defense Marine v. United States*, 720 F.3d 901, 909 n.6 (Fed. Cir. 2013)). The government cites several cases from our court and opinions from the GAO which recognize that "'adjectival ratings are merely a guide' for the agency's decision making process," *id.* (quoting *Hyperion, Inc. v. United States*, 92 Fed. Cl. 114, 119 (2010)), and argues that even among subfactors of equal weight, the presence of a significant weakness or several weaknesses in one could be decisive for the overall factor rating, *id.* at 26–27 (citing *Apptis Inc.-Costs*¸ B-402146.3, 2010 CPD ¶ 123, 2010 WL 2561522 (Comp. Gen. Mar. 31, 2010)). Intervenor argues that the use of adjectival ratings is not a mechanical process involving averaging and similar quantitative constructs, and that the factor evaluation was based on the agency's assessment of the severity of the understaffing issue. Def.-Intervenor's Mot. J. Admin. R. (Intervenor's Mot.) at 14–17.

The Court is not persuaded that the evaluation methodology employed by USCIS violated the Solicitation's stated criteria. The agency had decided that a Technical Proposal with any significant weakness would rate no higher than Marginal for the Technical factor, and one with deficiencies would receive a factor rating of Unacceptable, regardless of which subfactor evaluation contained them. AR, Tab 5 at 109. While this meant, as a practical matter, that the subfactor containing significant weaknesses or deficiencies would have the most influence on the overall factor rating, despite three of the subfactors having been deemed of equal importance and the fourth of lesser importance, the same is true in any procurement in which a particularly poor rating can be decisive. Plaintiff rejects this as "procedural equality" rather than "substantive" equality, Pl.'s Mot. at 33, but as long as one of the three equally-important subfactors was the one for which the significant weakness was found, the Court does not believe that the "relative importance" stated in the Solicitation, 48 C.F.R. § 15.304(d), was contravened.[21]

---

[21] The Court agrees with eVETS that the evaluation scheme contradicted the "relative importance" stated in the Solicitation by allowing the subfactor of lesser importance, Experience with Unions, to have the same decisive effect under the roll-up approach. *See* Pl.'s Mot. at 33 n.13. This error was not to plaintiff's prejudice,

It was not a departure from the relative importance of the subfactors that resulted in the Marginal Technical factor rating received by eVETS, but rather the exacting grading scheme employed by USCIS. The agency determined beforehand that if it were to find a significant weakness in the evaluation of a factor, the rating for that factor could not be higher than Marginal. AR, Tab 5 at 109.[22] No authority has been disclosed to the Court which disapproves of the use of such a minimum standard as part of the rating methodology, a rating ceiling akin to a pass/fail approach or an on/off switch. The Court notes that none of the evaluation documents simply rest on the subfactor rating label of "Marginal" in assessing the quality of eVETS's Technical Proposal, but discuss in detail why a significant weakness was assessed. AR, Tab 30 at 2066–68, 2071; Tab 35 at 2415; Tab 36 at 2424–25. It was the substance of these findings, and not the associated labels or the subfactor category in which the significant weakness was discovered, that mattered. In light of this, and considering the binding precedent which rejects the concept of computing an average based on adjectival ratings, *see Glenn Def. Marine*, 720 F.3d at 909 n.6, and the persuasive precedents showing the outsized influence a poor rating in one of several equally-weighted subfactors may have, *see., e.g., Apptis Inc.*, 2010 WL 2561522, at *5, the Court cannot find that the roll-up evaluation methodology violated 48 C.F.R. § 15.305.[23]

### 3.   *The Exclusion of eVETS's Proposal from the Best Value Trade-Off Analysis*

Plaintiff next argues that the agency acted irrationally by failing to include its proposal in the best value tradeoff analysis and to perform a best value tradeoff between its proposed lower price and CRI's technical superiority. Pl.'s Mot. at 40–47. Plaintiff concedes that case law allows an agency to exclude a proposal from a best value determination when the proposal is deemed "technically unacceptable,"

---

however, as no significant weakness or deficiency was found for that subfactor. AR, Tab 30 at 2075.

[22] If the SSP had not prescribed such a methodology, and it was instead adopted by the evaluators after proposals were reviewed, such a practice could potentially rob the ultimate source selection decision of its rationality. *See USfalcon*, 92 Fed. Cl. at 453–54. This was not the case here.

[23] The agency's non-disclosure of the roll-up method would not have affected the competitive strategy of any offerors, who presumably did not intend to have significant weaknesses or deficiencies in their proposals. If the undisclosed definition of Marginal --- which included "demonstrat[ing] a marginal solution and approach," AR, Tab 30 at 2054 --- were one that could apply only to the Operational Approach subfactor, the matter would be different. But eVETS has not made that case.

but stresses that its proposal was never assigned this rating. *Id.* at 41–42. In this regard, the SSA agreed with the ratings given by the SSAC and the TEC, neither of which assigned eVETS a deficiency or an Unacceptable rating. AR, Tab 36 at 2424. Plaintiff argues that, in the absence of a solicitation provision informing offerors that marginal proposals will not be considered in the best value determination, agencies must include them and consider whether their lower prices could provide the government with the best value compared to the more highly-rated proposals. Pl.'s Mot. at 43–44 (citing, *inter alia*, *Metis Sols., LLC*, B-411173.2, 2015 CPD ¶ 221, 2105 WL 4572442 (Comp. Gen. July 20, 2015)). Plaintiff maintains it "would have had a substantial chance for award" if its proposal was included in the best value tradeoff analysis. Pl.'s Mot. at 45–47.

The government responds that the Solicitation was silent regarding whether Marginal-rated proposals must be included in the best value tradeoff analysis, and argues that the agency thus had discretion to reasonably exclude eVETS's proposal from this analysis. Def.'s Opp'n Pl.'s Cross-mot. J. Admin. R. (Def.'s Reply) at 17 (citing *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1353–55 (Fed. Cir. 2004)). It contends that the SSA was not required to compare the eVETS proposal with the two higher-rated ones, as he had explained why he found plaintiff's file operations understaffing to pose "an unacceptable risk," making the proposal not "viable for a possible award." Def.'s Mot. at 29 (quoting AR, Tab 36 at 2425).

Intervenor notes that the TEC found plaintiff's file operations understaffing to represent "a failure to provide a reasonable, logical approach to fulfill much of the Government's file operations requirements," and did not consider the FTEs proposed to be "sufficient to meet the base year requirements." Intervenor's Mot. at 18 (quoting AR, Tab 30 at 2071, 2066). It recounts the SSA's explanation of his misgivings regarding the eVETS proposal, *id.* at 19 (citing AR, Tab 36 at 2424–25), and stresses "the performance concerns raised by the TEC and the SSAC," and "the potential pricing concerns raised by the SSA," explaining that only further discussions could have made the eVETS proposal acceptable for award, *id.* at 20. In its reply paper, CRI argues that plaintiff's proposal should be considered as failing to conform to the Solicitation's material terms, making it technically unacceptable; and that by omitting the file operations staff needed to process IV packets, the eVETS proposal failed to provide the true costs necessary for a meaningful comparison with other proposals. Def.-Intervenor's Opp'n Pl.'s Cross-mot. J. Admin. R. (Intervenor's Reply) at 3–4, 11–12.[24]

Under the unusual circumstances presented by this case, the Court cannot say that the agency erred in its best value analysis. Once the one offeror which received an Unacceptable rating for the Technical factor dropped from the picture,

---

[24] Intervenor calculates the TSC file operations staffing shortfall to be 28.4% of the FTEs proposed by eVETS for that CLIN. Intervenor's Reply at 11 & n.17.

eVETS's proposal was the lowest priced one of the four remaining.  *See* AR, Tab 36 at 2419–20.  If technically acceptable, it should have been included in the formal best value tradeoff.  Plaintiff, however, received a Marginal rating for the Technical factor, which meant it did "not meet the requirements to be rated Acceptable," but "ha[d] a reasonable chance of becoming Acceptable," were there "the opportunity for discussions and/or clarifications."  AR, Tab 30 at 2054.  That opportunity did not exist, though, when the FPRs were being evaluated, and thus the eVETS proposal was less than Acceptable when the Source Selection Decision was being made. While, as a general proposition, proposals which are marginal might qualify for inclusion in a best value tradeoff, it is difficult to see why this should *require* a proposal which, by definition, has been found *not acceptable* to be nevertheless considered for award.[25]

Even if, by falling somewhere in the limbo between "technically unacceptable" and generically "acceptable," the eVETS proposal should have had its low price considered against its technical shortcomings, this formality would not have altered the SSA's decision.  Far from disregarding plaintiff's proposal due to the Marginal rating, the SSA explained in detail that he found "the negative impacts" due to file operations understaffing to be "severe," and that prevention of these impacts would require "unbudgeted and disruptive contract cost increases." AR, Tab 36 at 2425.  He termed this scenario "an unacceptable risk," and noted the prospect that the resulting cost increases could "be so large as to be out of scope of the contract."  *Id*.  Earlier in the decision, he noted his concurrence with the SSAC view that the eVETS "Marginal rating and associated weaknesses and risks were too significant to overcome for consideration of an award," *id*. at 2424, and he began the best value tradeoff discussion by stating that his "above concerns" with the eVETS proposal removed it from the group he "consider[ed] viable for a possible award," *id*. at 2425.

By finding that the technical shortcomings of the eVETS proposal were "too significant to overcome" and posed "an unacceptable risk," the SSA left no doubt that he believed that the lower price could not justify an award.  This was underscored by his cognizance that costs would be higher than proposed.  To fault the SSA for not repeating his conclusion that "this is an unacceptable risk to me" when the best value analysis began two paragraphs later, and for not adding "even to save $15 million," would elevate form over substance.  The formal, express inclusion of the eVETS proposal in the best value tradeoff would not have made a difference, and its absence cannot justify a remand, much less the setting aside of the award to CRI.

---

[25] The Court notes that at an earlier stage in the process, when the competitive range is selected, the FAR allows an agency to exclude all but the highest rated proposals.  *See* 48 C.F.R. § 15.306(c).

### *4. Plaintiff's Technical Proposal Was Not Evaluated Disparately*

Plaintiff also alleges that USCIS evaluated its proposal disparately from the other offerors' proposals, violating the FAR requirement "that contractors receive impartial, fair, and equitable treatment."  Pl.'s Mot. at 47 (quoting 48 C.F.R. § 1.602-2(b)).[26]  Three specific examples are provided by eVETS to demonstrate this alleged disparate treatment, as eVETS contends it did not receive strengths for similar qualities and elements that warranted strengths in the evaluations of other offerors.  *Id.* at 47–50.  Plaintiff contends that if it had received these strengths, its Operational Approach would have received a Good rating and its Management Approach would have received an Outstanding rating.  *Id.* at 50.

While these types of challenges can succeed when protesters demonstrate inconsistencies in subjective judgments, *see USfalcon*, 92 Fed. Cl. at 462, such inconsistencies require the existence of nearly identical provisions in the proposals under consideration.  When a court is not convinced that the aspects of the proposals brought to its attention are indistinguishable for purposes of the evaluation, then the exercise instead crosses the line and involves the second guessing of "minutiae" which we are not allowed to undertake, *see E.W. Bliss Co.*, 77 F.3d at 449.  A careful review of the proposals in question shows that the evaluated portions are not so similar as to suggest disparate evaluations.

Plaintiff's first example of alleged disparate treatment is the strength [XXXXX] received under the Operational Approach subfactor for its training plan.  Pl.'s Mot. at 47–48 (citing AR, Tab 30 at 2100).  Plaintiff argues that its own training plan was described in positive terms by the TEC, yet no strength was assigned.  *Id.* (citing AR, Tab 30 at 2067–68).  But two of the features warranting the strength, remedial and short deadline trainings, do not have counterparts in the eVETS proposal, and the training portions of the two proposals are hardly identical --- [XXXXX]'s section is about twice as long as eVETS's, and includes additional detail such as 39 different aspects of its training.  *Compare* AR, Tab 65d at 4388–91 ([XXXXX] proposal) *with* AR, Tab 29c at 1997–98 (eVETS proposal).

The next example eVETS provides is the strength given another offeror under the Operational Approach subfactor for "[t]he use of statistical process control charts."  Pl.'s Mot. at 48 (citing AR, Tab 30 at 2090).  Plaintiff argues that its own proposed use of control charts was ignored, *id.* (citing AR, Tab 29c at 2004), but its brief reference to such charts is not comparable to the other offeror's explanation of what the charts would enable it to do, *see* AR, Tab 63f at 3892.

---

[26]  This provision serves as "the codification of the government's duty, previously implicit, to fairly and honestly consider bids."  *MORI Assocs., Inc. v. United States*, 102 Fed. Cl. 503, 523 (2011).

The third example eVETS cites for disparate treatment is the proposed use of proprietary data tools. Pl.'s Mot. at 49–50. [XXXXX] and CRI each received a strength under Management Approach for their tools, but eVETS didn't --- even though plaintiff did receive a strength under Operational Approach for its tool. *See* AR, Tab 30 at 2062, 2070, 2073–74, 2103. A review of the proposals, however, shows that the actual disparity is in the approaches taken by the offerors in describing the benefits provided by these proprietary tools. Intervenor extensively discussed its proprietary tool in both the Operational Approach and the Management Approach portions of its proposal. Under Operational Approach, the tool is the topic of three bullet points and sixteen sentences, scattered over nine separate pages and involving various tasks and functions such as remedial training, quality approach, cost control, and fee collection. AR, Tab 28c at 1608, 1636, 1638, 1640–43, 1645–46. In the Management Approach section of the proposal, over a full page is devoted to the manner in which the tool will be of benefit, in addition to an earlier bullet point. *Id.* at 1648, 1653. This resulted in a strength assigned to CRI under each subfactor. AR, Tab 30 at 2059, 2062.

[XXXXX] also extensively discussed its proprietary tool under both subfactor sections. Under Operational Approach, it is mentioned on eight different pages, including a discussion concerning staffing that is more than a page in length. AR, Tab 65d at 4357, 4363, 4370, 4373–74, 4390, 4397, 4399. [XXXXX] devoted a bullet point and a full page of its Management Approach section to the tool. *Id.* at 4401, 4403–04. It received a strength only under Management Approach. *See* AR, Tab 30 at 2100, 2103.

Plaintiff provided an extensive discussion of its proprietary tool in the Operational Approach portion of its proposal, mentioning it on eighteen separate pages, AR, Tab 29c at 1964–67, 1971, 1978, 1984, 1987, 1990–91, 2000–07 --- including an extended treatment about two pages in length, *id.* at 1965–67 --- and also included three sentences and four bullet points about it in the executive summary, *id.* at 1963. But the tool was barely mentioned in the Management Approach section of the proposal --- two sentences discuss it, and another sentence and two bullet points reference proposed employees who would have had some responsibilities regarding it. *See id.* at 2007–09, 2014–15. Thus, if the agency failed to appreciate how the eVETS tool could be a strength under the Management Approach subfactor, this was because eVETS failed to make this case in its proposal. Had eVETS devoted as much attention to the tool under Management Approach as it did under Operational Approach, it might well have replicated the strength received for the latter. Any disparity was plaintiff's own doing.

As described above, the record does not show that very similar features were evaluated differently in the eVETS proposal as compared with those of other offerors. Plaintiff has failed to demonstrate that the agency acted arbitrarily or unlawfully in this regard.

### 5.  *The Agency's Determination of CRI's Responsibility Was Not Unreasonable*

Plaintiff also challenges the agency's determination that CRI is a responsible contractor, due to information concerning intervenor's major subcontractor, FCi, that eVETS contends the agency ignored.  Pl.'s Mot. at 51–56; Pl.'s Reply at 21–23. Plaintiff argues it was unreasonable for the agency to have found that FCi was responsible --- and in particular to have found "a satisfactory record of integrity and business ethics," 48 C.F.R. § 9.104-1(d) --- in light of allegations in the divorce proceedings involving two FCi executives, and two state court civil proceedings involving FCi.  Pl.'s Mot. at 51–57 & n.29.  In connection with this challenge, eVETS has moved to supplement the record with the complaint from one of the state court cases, Ex. B to Pl.'s Mot. Suppl.; articles from two Internet news sites concerning the divorce proceedings and the other state court case, Exs. C & D to *id.*; an Internet profile of an FCi employee whose actions were at issue in one of the state cases, Ex. E to *id.*; and the first page of the results of an Internet search regarding FCi, Ex. F to *id.*  Since allegedly pertinent but overlooked information bearing on a contractor's responsibility is the sort of "information that by its very nature would not be found in an agency record," *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004), the Court finds that supplementation of the record is "necessary in order not 'to frustrate effective judicial review,'" *Axiom Res. Mgmt.*, 564 F.3d 1381 (quoting *Pitts*, 411 U.S. at 142–43).  Accordingly, the motion to supplement the record is GRANTED as to Exhibits B through F.

A contracting officer is "generally given wide discretion" regarding responsibility determinations, and "is the arbiter of what, and how much, information he needs."  *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999) (citing 48 C.F.R. § 9.105-1(a)).  While the Federal Circuit has noted that "this discretion is not absolute," it has also held that a protester "necessarily bears a heavy burden" to demonstrate that a contracting officer failed to adequately explain why unfavorable information did not preclude a finding of responsibility. *Domenico Garufi*, 238 F.3d at 1335, 1338.  That particular case involved the criminal conviction and indictments, relating to federal contracts, of an individual who once controlled the contractor.  *See id.* at 1327–28.  Nothing comparable has been shown by eVETS, and a review of the record shows that the Contracting Officer's responsibility determination was reasonable.

The Contracting Officer executed the responsibility determination on April 15, 2015.  AR, Tab 37a at 2429.  In finding a satisfactory record of integrity and business ethics, she relied upon the BEC's review of the System for Award Management (SAM) and Federal Awardee Performance and Integrity Information System (FAPIIS) data concerning CRI and FCi, and reviewed the SAM certifications for both.  *Id.* at 2431; *see also* AR, Tab 37d at 2438–63b (Feb. 27, 2015 SAM report), Tab 37e at 2463-1–2463-26 (Aug. 6, 2014 SAM report).  She also relied upon the

past performance determination of the BEC, which utilized Past Performance Information Retrieval System (PPIRS) records.  AR, Tab 37a at 2431; *see* AR, Tab 31a at 2116.[27]  The contracting officer explained: "[T]he BEC searched the internet to see if there were any derogatory news articles in regards to past performance or business ethics and integrity for CRI or FCI [sic].  There were none found."  AR, Tab 37a at 2431; *see also* AR, Tab 31a at 2109–17; AR, Tab 71 at 4480.  The final BEC report on past performance shows that the Better Business Bureau and Dun & Bradstreet databases were previously searched for "any negative information regarding past performance," AR, Tab 31a at 2216, and that after the receipt of FPRs, the SAM, FAPIIS and PPIRS records were again checked, and another Internet search of news articles was conducted, *id.* at 2115–17; *see also* AR, Tab 72 at 4501–02 (FAPIIS /PPIRS report for CRI); AR, Tab 73 at 4503–04 (FAPIIS/PPIRS report for FCi).[28]

Based on the above, the Contracting Officer's determination appears perfectly rational.  Plaintiff faults her for not uncovering or discussing allegations in divorce proceedings that were publicly reported in an article posted by *The Daily Caller* on March 9, 2015.  *See* Ex. C to Pl.'s Mot. Suppl.  Regardless of whether the second Internet search had already been conducted prior to that date,[29] or if the search failed to produce this article, the Court cannot see how the failure to discuss such allegations can taint the responsibility determination.  After all, "[r]eview of a contracting officer's procurement decision should not involve assessing his computer proficiency or calibrating what the sufficiency of a computer search entails."  *Acrow Corp. of Am. v. United States*, 97 Fed. Cl. 161, 179 (2011).  Moreover, mere allegations in civil, family law proceedings are a far cry from the convictions and indictments which the Federal Circuit found sufficient the carry the "heavy burden" in *Domenico Garufi*, 238 F.3d at 1338.

---

[27]  The FAR requires that contracting officers consider information from FAPIIS, SAM, and PPIRS in making the responsibility determination.  48 C.F.R. § 9.105-1(c).

[28]  The BEC's post-FPR search of the internet apparently resulted in no additional news articles recounting poor performance by any of the contractors or their major subcontractors.  AR, Tab 31a at 2116, 2124, 2132, 2145, 2151.  As a result, the only news articles in the administrative record were from searches conducted in mid-October, 2014.  *See* AR, Tab 71a–g, at 4481–92.

[29]  The exact date of the second Internet search regarding CRI and FCi cannot be determined from the record, which shows that the BEC re-convened to evaluate the FPRs on February 18, 2015, and apparently distributed its reports on April 3, 2015.  AR, Tab 36 at 2422.

Similarly, the one state court matter which plaintiff stresses in its motion, coincidentally also filed on March 9, 2015, *see* Ex. B to Pl's Mot. Suppl. at 1, does not involve any judicial or law-enforcement determinations concerning wrongdoing by FCi. Indeed, according to the pleading, filed by FCi, *it* was the victim of the wrongdoing alleged. *See id.* at 2–13. Plaintiff mischaracterizes the lawsuit, suggesting that one of the parties sued by FCi was a "subcontractor" on a federal contract and suggesting that a potential violation of the Anti-Kickback Act of 1986, 41 U.S.C. § 8702, was involved. Pl.'s Mot. at 55–56. Instead, FCi was suing one of its former employees, a business in which that former employee had an unconcealed interest, and a firm that had been retained by FCi as a lobbyist. *See* Ex. B to Pl.'s Mot. Suppl. at 2–6. The three defendants had allegedly conspired to hide kickbacks from the lobbying firm to the other business, to reward the former employee who had retained the lobbying firm. *Id.* at 6–7. Although the lobbying firm was retained to lobby regarding a federal contract, *see id.* at 35–36, it was not a subcontractor performing the contract, and thus the federal act was not implicated. *See* 41 U.S.C. § 8701(2), (4), (7)–(8). The Court notes that FCi did inform the agency, in somewhat cursory fashion, of the "ethical conflict" necessitating the departure of the individual in question, on February 10, 2015. AR, Tab 37c at 2437.

In any event, the Court does not see how a lawsuit brought by FCi against an employee it fired, and against two entities which it alleges conspired to violate duties owed to FCi, reflects upon FCi's responsibility, much less in a manner that required further investigation and an explanation from a contracting officer.[30] Plaintiff has failed to show that the determination of CRI's and FCi's responsibility was irrational.

### 6.  *CRI's Past Performance and Corporate Experience Assessments Were Not Unreasonable*

Plaintiff's final argument is that the agency erred in assigning intervenor a Low Risk rating under the Past Performance factor, and a Good rating under the Corporate Experience subfactor. Pl.'s Mot. at 57–61. Plaintiff contends that the three contracts that CRI relies upon that the latter actually performed either were not or should not have been found relevant for purposes of the two evaluations. *Id.*

---

[30] Plaintiff relegated its discussion of the other state court lawsuit to a footnote, *see* Pl.'s Mot. at 56–57 n.29, and so, too, will the Court. That civil lawsuit, brought by another government contractor against FCi, apparently alleged that a former employee of that other contractor violated her non-compete clause and brought confidential information to her new employer, FCi. *See* Ex. D to Pl.'s Mot. Suppl. Although the case does involve competition for a federal contract, the Court does not find that mere allegations in a civil lawsuit are sufficient to meet the "heavy burden" recognized by *Domenico Garufi*, 238 F.3d at 1338.

Case 1:15-cv-01022-VJW   Document 71   Filed 05/04/17   Page 33 of 34

According to eVETS, USCIS improperly allowed CRI to rely upon its large subcontractor FCi's experience and past performance. *Id.* at 57–58.

Under the Solicitation, relevant experience for both the Corporate Experience subfactor and the Past Performance factor was based on the same four elements:

1. Managing operations over multiple, geographically dispersed locations[.]
2. Managing surges and spikes[.]
3. Providing services in correspondent management, data-entry, fee receipting, and file operations.
4. Managing multiple hundreds of employees over multiple shifts[.]

AR, Tab 8b at 263; *see also id.* at 259.  In both evaluations, the experience of the prime contractor offeror and its major subcontractors was to be considered "in the aggregate" to determine relevance or similarity to the requirements being procured. *Id.* at 259, 263, 273–74.  Accordingly, it was appropriate for the TEC to rate intervenor's Corporate Experience as Good when the fourth element "was met by FCi but not CRI," AR, Tab 30 at 2063; and for the BEC to assign Low Risk for Past Performance when CRI was "not able to demonstrate [it] managed multiple hundreds of employees," but FCi was able to do so, AR, Tab 31a at 2116–17.  Under the evaluation approach explained in the Solicitation, it was entirely rational for the agency to have determined that the experience of CRI, which satisfied three of the four elements, and the experience of FCi, which satisfied all four, could in the aggregate demonstrate relevance.  *See* AR, Tab 30 at 2063; Tab 31a at 2116–17.[31]

Plaintiff argues that one of the CRI contracts was never determined relevant based on language from the initial Past Performance report, carried over into the final version, which states "[t]here is not enough information in the questionnaire to determine whether this contract is relevant or not."  Pl.'s Mot. at 58 (quoting AR, Tab 31a at 2110).  The BEC later states, however, that the issue which caused this difficulty "was resolved with the submission of the FPR."  AR, Tab 31a at 2117. Plaintiff also focuses on matters that are not part of the relevance calculus, such as teaming efforts and volumes of work, and disputes the judgment of the agency in light of a few criticisms that appeared in the CRI past performance questionnaires. Pl.'s Mot. at 60–61 & n.34.  But the agency adequately explained the basis for finding the experience relevant, *see* AR, Tab 31a at 2109–17, and thus "the great deference and discretion an agency is given to determine the relevance and quality of an offeror's past performance will not allow this aspect of the evaluation to be

---

[31]  Moreover, offerors were told that the four listed elements "will be used to assist in determining relevance of past performance," AR, Tab 8b at 263, not that all four must be demonstrated for any particular contract to be considered in the evaluation.

- 33 -

disturbed." *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 259 (2011) (citations omitted).  Plaintiff has failed to demonstrate that the agency's treatment of CRI's experience was unreasonable.

### III.  CONCLUSION

For the foregoing reasons, defendant's and defendant-intervenor's motions for judgment on the administrative record are **GRANTED** and plaintiff's cross-motion for judgment on the administrative record is **DENIED**.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge